First, I'd like very much to thank the panel for indulging me. I was one of those lawyers that was in another state at the time I got word. And the first message was, if you can't make it, let us know. And the second message that I received was, your other option is to submit on the brief. So I apologize for any consternation I may have caused the panel in trying to get this matter said at a time when I could be here, and I appreciate the indulgence. Your Honor, we've raised a large number of issues here, and I know we won't have time to discuss them all in detail. I'd like to limit my comments to the pre-indictment delay, the 3292 extension of the statute of limitations, and then the question of whether the evidence proved counts 4 and counts 12 through 18. If the Court, knowing that, has questions on other matters, I'd appreciate being interrupted with those questions so I can try to address something that any member of the panel might be interested in. On the question of the pre-indictment delay, it appears that the district court and the government's conclusion is that there was no showing of any prejudice from the delay. And I've tried in different ways to try to elucidate the record that does establish prejudice, although I'm reading my own briefs, I'm concerned whether that's been effective. So I'd like to take a minute just discussing two aspects of the prejudice that the appellant alleges based on the record. One aspect is this whole phenomenon of a United States Embassy official named Arno Parati writing a letter to Italian officials just a few days, less than two weeks after the scuttling of this yacht off the coast of Italy, and saying in the letter to the Italian authorities investigating the scuttling of the yacht, you have given us the following identifying information about a person named Lebovich. And the reason that that letter from Parati to the Italian authorities is significant in the mind of the defendant is that there is greater description and greater information and a different spelling of the first name and a different country of origin given in the letter from the U.S. Embassy the request of the Italian authorities for background and investigation. And the defense never received from the government, either in discovery in this case as rated material or in his two Freedom of Information Act requests, never received the communication from the Italian authorities. But it is clear that it came after the date when the deposition testimony of the investigating Italian magistrate, which was heard in the criminal trial here, when that testimony was that the defendant had identified photographs of Lebovich. And so the statement from the U.S. Embassy official in the letter saying to the Italian authorities, you've asked me for background information to give you what we can give you about this Lebovich, which has a description, an age, a different first name, slightly different spelling of a first name and a different country of origin, strongly suggests that the photograph that was identified led the Italian authorities to write that letter to the U.S. Embassy. And they had some information that was different than what they received from the defendant about this Lebovich whose identity they were asking about. And they identify him as a skipper who was, I believe, Lithuanian. And according to the defendant's statements to the investigating authorities in Italy back in 92, he was a person who identified himself as a Russian train skipper, a captain of the boat. And so I hope the Court can see at least that what the defense is attempting to establish with this evidence is that there was favorable information in the hands of the Italian authorities that would corroborate or tend to support the defendant's statement that a Captain Lebovich was the one who was on the yacht at the time that it was scuttled. Is there anything in the record, I realize in your brief you speculate, but anything in the record to show that this was tactical on the part of the government? You mean so that the government could gain an advantage over the defense? Well, Your Honor, the things that were suggested, I think I've already discussed in the brief, there is no admission by the government that there was a delay for the purpose of gaining an advantage. However, we do have in the record, obtained through Freedom of Information Act, again, a statement by the United States authorities back in 93 that the government had no interest in prosecuting the defendant. And that coincided with the defendant's being released by Italian authorities and accusing the Italian authorities of trashing this $3.5 million yacht. And what the accusation was then was that by hacking up the yacht with hatchets and other tools, looking for possible drugs, because the interest was, at the time, the interest was in whether or not there was some drug connection by the Italians. And again, the testimony and the deposition by the Italian official was that, well, we were looking into this question of why the yacht was scuttled, but we really were more interested in this Italian pizza connection and whether or not there was any kind of mafia connections here. And it was the defendant's allegation at the time that the Italians were destroying the yacht looking for evidence of mafia crime with the blessing of the United States government. And that by not prosecuting then, when all of this evidence that would be favorable was available, and waiting until really six or more years later, all of that was gone. So there would be no credible claim that the United States government had participated in destroying the vessel. That would be the closest thing I think that we have in terms of evidence in the record on that point, Your Honor. The other – the only other point on prejudice that I wanted to bring to the Court's attention was the significance of the Mulas interrogation or interview. And Mr. Mulas is a person who works on the dock who was interviewed very shortly after the Italian Coast Guard rescued the defendant and his two crewmen, and Mulas said he saw strangers come in going from the yacht. And one of them, who would generally match the description of this Lebovich described in the Peretti communique back to the Italian authorities, being 40ish and with a beard, had come around asking for the boss and asking whether he should be meeting him there at the store. And this would be corroborative of the defendant's statement that he met Lebovich at this store, this restaurant that was owned by Felice Pisa, and that there were indeed people coming and going – that he was interviewing for a new captain. The other thing is that the government seems to say that there is no prejudice because the defendant is obviously guilty. And that's always the case. If in fact delay has resulted in the defendant not being able to defend himself, then the case that remains will be an overwhelming case. But – Let me just ask a question. Didn't your client oppose the taking of the deposition of Mulas in 1999? Your Honor, I believe that the record shows that at the time that Mr. Marmorow, I believe, was not interested in taking the deposition of Mr. Mulas, the government had not provided any information to the defense that Mulas had made any statements or that there was an interview. In other words, I can't find any evidence in the record that the defense had been provided with any basis for believing that Mulas was a witness who had any information on the case until 2000, when it was no longer possible to find Mulas. Well, if you did oppose it, it's hard for me to say that it supports your claim of actual prejudice that his deposition was not taken. I understand. Your Honor, I'm not sure that it was a question of opposing it. I'm just – I'm not sure I understand the record the way the government does on that point. But nor am I sure that the record shows that Mulas was, in fact, available for a deposition, only that that was one of the names that was listed. But I understand if the Court concludes that the record shows that the defense opposed taking a statement from a man that we now claim his absence is prejudicial, but it would be difficult for us to also claim that that was the government's fault. On the question of overwhelming evidence, I would like to just sort of remind the Court that the government is claiming that Mr. DeGeorge is a brilliant lawyer who has engaged in 20 years of insurance fraud, knows how to do this, and that he is otherwise an educated man with degrees in science and whatnot, besides being a practicing lawyer. The – Mr. Lerner, the lawyer for Cigna, testified that the policy was invalid because the captain that was approved by the insurance company was not at the helm. And that the – and in the civil trial, Cigna did not disagree with or dispute at all the Leibovitz story because that story invalidated the insurance policy. Because – and that was Lerner's testimony in the criminal trial, that this statement, this – the statement in the proof of loss that was at issue in the 1996 mailing account And the entire Leibovitz story supported Cigna's claim that there was no insurance because the policy was invalid if they didn't approve the captain. And so there was not even in the civil case an issue about whether or not Leibovitz was the captain of the ship, because the plaintiff was Cigna, the defendant was Polaris, and the plaintiff, Cigna, said, we're fine with that story. It proves that our policies cannot be collected upon. So it – my point here is that the – in the civil trial, the issues were – were different than the issues that were at question here. But clearly, the defendant would have known, if he was this brilliant insurance fraud king that he was portrayed to be by the government, he would have known that not having the approved captain would invalidate the policy that they allege he was attempting to collect fraudulently. In addition, the manner in which the yacht was damaged would – would never have resulted in it being sunk, because the testimony was that Mr. DeGeorge was told that this yacht was unsinkable, and there's no evidence that he would have – But the Titanic was supposed to be unsinkable, too. I don't think – is there really any such thing as an unsinkable vessel? Your Honor, if you take a person who's trained in science like the defendant, and you are told that the yacht is unsinkable, presumably you wouldn't pick that yacht to sink for insurance money, and you certainly wouldn't pick a way that wouldn't work to sink it, because what happened here is these holes were cut in such a way that they acted as baffles, and even though it went around and took on water, it never took on enough to sink. Yes, it's impossible to know if anything is unsinkable. I understand that point, but it's a poor – it's a poor target for insurance fraud if it's something that you're trying to sink when it's not capable of being sunk. And the only point of these comments is that the case is not necessarily so overwhelming if you look at the – all of the circumstances. It's so easy at the afterwards, if all the defense evidence that might have been available in 92 and 93 is no longer available, it's so easy for the government to indict in 99 and then tell this Court in 2004, well, this was an overwhelming case, when what was left may have been evidence that pointed toward guilt, to motivated witnesses who had repeatedly said under oath that there was a Captain Leibovitz and that his compatriots came and settled the yacht, and then were obviously frightened about the consequences of being prosecuted themselves. Was the Leibovitz story part of the defense in the Cigna Polaris trial? No, Your Honor. In fact, as I said, the attorneys for the plaintiff, for Cigna, did not dispute that story. And, Your Honor, this Court, a panel, a different panel of this Court, affirmed on a theory other than fraud and other than that the plaintiff proved that the Leibovitz story was false, because it wasn't even contested by the plaintiff. The other one – the other theory is one that I'm a little reluctant to discuss, because it's – I'm not sure if it's Latin or Greek, but it's a very difficult phrase. And what it sort of means is, in maritime insurance situations, the insured has a duty to disclose anything that the insurer might want to know, even if it's not – they're not asked. And this principle, which I'm sorry – I'm embarrassed that I don't – I'm not sure I can pronounce, was held to be a ground to invalidate the policy, because the maritime loss history was not disclosed, even though it was not held to reach the level of fraud. And, you know, the government sort of portrayed the loss of the civil case as sort of prima facie proof of fraud. And yet that wasn't really what was at stake in the civil case. For that reason, we do address whether or not any of the alleged perjury was material, because all of the alleged perjury has to do with whether the Leibovitz story was true. But even if false, it would have to have been material to something that was at issue in the civil case, because it was all alleged perjury in the civil case. And as I say, the SIGNA never contested – in fact, agreed with – the Leibovitz story, because it supported their right to rescind the policy. And that was a rescission – you know, rescission of the insurance policy case. Just briefly, I would like to talk about count four. And this is the mailing in 1996 of a document that was created in 1992 and mailed into the insurance company. And this was mailed by the attorney for Polaris as an attachment to some document during the civil litigation between SIGNA and Polaris. And I submit that if that constitutes a mailing adequate for a – for a mail fraud, then any time any lawyer or any prosecutor even asks the opposing lawyer to mail something related to the alleged underlying facts of the case, then that could constitute a basis of a fraud count. There is no sense in which the mailing in 1996 of a proof-of-loss document that by all could be – could be said to have advanced some fraudulent purpose. It wasn't mailed for the purpose of saying, look, you have to pay us because what we said in here is true. It was mailed as an exhibit because it was related to the history of the case. But it by no means advanced – advanced the fraudulent scheme that was alleged by the government. And even the government in the – in the Respondent's Brief says it was done in connection with the civil suit. But in connection with the civil suit that surrounded an insurance policy is not adequate to make the nexus required under the mail fraud statute. And so your time has run out. Your Honor, I would like – if there are any – if the Court has any questions on the extension of the statute of limitations issue, I'd be happy to try to address them. I don't believe so, but we will restore some time for you. Thank you very much. Apologize. May it please the Court, Eileen Decker on behalf of the United States. Your Honors, I will first address the statute of limitations argument. And specifically, the charges against the Defendant were not barred by the statute of limitations. 3292 does not require that there be a grand jury investigation initiated. But even if it did, a grand jury investigation in this case – I wonder if you could speak up just a little bit. Oh, yes, Your Honor. I apologize. The government has two primary arguments in this area. First that 3292 does not require that a grand jury investigation have been initiated. And secondly, that even if it does require that, a grand jury investigation in this case had in fact begun. Let me just ask a question here. Can you point to any Ninth Circuit case applying 18 U.S.C. 1503 that is found in a subpoena coupled with a particularized investigation of the Defendant is sufficient to establish a pending grand jury investigation? No, Your Honor. I cannot point to a specific Ninth Circuit case in this area under 1503. However, the other cases that the government did cite in its brief does refer to the Ninth Circuit case in Ryan, which is not inconsistent with the other circuits. In Ryan, the Court found that the issuance of the grand jury subpoena in that case where it was – there was no – the destruction of evidence had occurred prior to the beginning – prior to the issuance of the grand jury subpoena. So the facts in that case were different. The court in that case, the Ninth Circuit, found that no grand jury had been initiated prior to the destruction of the evidence. Because there was no proof the grand jury was investigating anything. Correct. Correct. However, in this case, there is proof that the grand jury had been initiated because a grand jury subpoena had been issued as well as a request to a foreign country indicating that the purpose of obtaining the evidence was for a grand jury investigation. And all the evidence that was collected was, in fact, ultimately used by the grand jury in its evaluation of the case in the return of an indictment. Thank you. I realize Counsel has spent a substantial amount of his time on all of the other issues. So I do want to address the statute issue if the Court has questions in this area. However, because of the concerns of time, I do want to also address the issues presented by Counsel. So may I ask if the Court has specific questions on the statute issue, the 3292 and statute limitations concern? I would suggest to the Court, with respect to the government's position, that the plain language of the statute does indicate that a grand jury investigation need not be initiated and to respond to defendant's reply brief, we are not asking the Court to eliminate or not refer to certain language in the statute. The statute as a whole indicates that the district court before which a grand jury is empaneled to investigate the offense is a venue requirement. Which district court to present the evidence, to present the application to and which grand jury would be receiving the evidence from the foreign country? Counsel, I'd like you to address Count 4. Would you just talk to me about Count 4 for a minute? Yes, Your Honor. On the sufficiency of the evidence, Count 4 is the mailing of the summary judgment motion. That was the mailing of the summary judgment motion by Polaris, a company which the evidence at trial demonstrated that defendant controlled. Further, I'd point out to the Court that the evidence at trial demonstrated that defendant controlled the litigation in the civil case. He determined to pursue it. Ebeling, Falco, and Lerner all testified that defendant was active in every aspect of the litigation. This was the summary judgment motion, which was the culmination, defendant had hoped, of his scheme to defraud Cigna. He had hoped by litigating this case that he would get Cigna to cave and to determine that it would be easier just to pay the defendant rather than to pursue continued litigation in the case. And Mr. Ebeling testified to that at trial, that the defendant specifically picked Cigna as the insurance company because of their litigation track record. So it was the government's theory that the mailing of the summary judgment motion was in fact the culmination of the plan, that he sought to get a court ruling by the mailing of that and submission of that summary judgment motion to obtain a judgment against Cigna, which again is the culmination of his plan to get payment on the insurance policy. If he had been successful, he would have received that payment.  Yet that mailing was in furtherance of his overall scheme to receive payment from Cigna. Yes, so that also dovetails with a question I have about the restitution order. We have a case called Barani in which there was a reversal of a restitution award covering attorney fees. Are you familiar with that case? No, Your Honor, I have to say that I'm not. Well, that won't help me then because I wanted to ask you whether that case is distinguishable from this one, potentially on the ground that in this case the litigation was a part and parcel of the fraudulent scheme. I apologize to the court. Perhaps if the court could just give me some of the general facts regarding Barani, I might be able to distinguish the facts of this. That's okay. It's kind of a hard thing to do, and you don't have that much time. Yes. With respect to the other counts in the indictment where the sufficiency of the evidence is alleged, which counsel claims that there was insufficient evidence, and specifically on the perjury counts, a defendant makes two arguments that the claims or the questions were ambiguous, and we would ask the court to look at each question in the context. Count 12, which dealt with whether or not there were tools on board, immediately preceding to that question, the question was, how did the holes get in the boat? And defendant responded, I have no opinion one way or another. And then the subsequent question was, well, were there tools on the boat? And he said no. That question is certainly not ambiguous in context. And further, with respect to count 16, defendant claims that there was insufficient evidence. Both Evelyn and Falco testified with respect to count 16 that defendant had either purchased the tools himself or had sent his co-defendants to purchase the tools. So there was sufficient evidence with respect to that particular point. With respect to pre-indictment delay, defendant does make a number of arguments. With respect to the Parati issue, and that the United States provided information to the Italian authorities, the record indicates that the Italian authorities made a request to the United States for information regarding a number of people related to this case, including Mr. Libovich. The American authorities responded to that request, and they indicated they didn't have any information regarding Mr. Libovich. The United States did provide information regarding Mr. DeGeorge on November 23rd, after defendant had been arrested and detained for making false statements to the government of Italy, and while they pursued their investigation. On November 23rd, over 10 days after he was arrested, the United States said that there could be a possible connection to a drug smuggling operation. But within 10 days, the United States retracted that and said, we've pursued it and it appears that there is no merit to that. So the defense arguments that defendant was detained for a mafia connection or drug smuggling connection really bears no weight in the facts whatsoever. With respect to the Mulis argument, the defense did not challenge in the district court the timing of the discovery. The government did provide discovery on a timely basis, and as soon as it was provided to the government. And in fact, the defense did challenge the taking of the Mulis deposition from the very beginning. And I believe the evidence in the case does bear out that only Mulis became of interest to him when he filed his motion for pre-indictment delay, and it was clear that Mulis could not be found. Mulis, nevertheless, never identified a Captain Lebovich. He identified a number of strangers going to and from the boat. That, I believe, responds to the arguments that counsel has made in his argument. I note that I do have some time, and I don't want to waste the court's time, but I hesitate to walk away without having addressed an important issue on restitution, Your Honor. I can only say on restitution in this case that the district court did find that the civil litigation was part and parcel of defendant's overall scheme, that he intended to collect on the policy no matter what it took, and that he was willing to spend considerable resources, and Cigna spent considerable resources, in order to succeed in his plan to obtain the proceeds of that insurance policy. And for that reason, the court included the loss incurred by Cigna in calculating loss under the guidelines, and for that reason, the court found that Cigna, a victim of this crime, had been out considerable amount of money and awarded restitution. I realize that may not answer the court's question, since I'm unfamiliar with the Bernine case, but perhaps if there's a more specific question, I could address that. You cited U.S. v. Cummings, but in U.S. v. Cummings, it distinguishes its holding from the Bernine case about which Judge Graber asked. So I think I can't ask the question, since you're not familiar with the Bernine case. No, but perhaps if there's a more specific factual question that the court might have, again, I hesitate to leave an issue unresolved before the court and to not have the opportunity to address it, and I apologize to the court for not being familiar with that case. Well, the question really is whether the attorney fees are actual damages that arise from the crime in question. And that's what the case turned on. There, the court said that the choice to defend and how much to defend was really only tangentially related to the particular crime in that case. Well, in this case, I would suggest the evidence is the opposite. As alleged in the indictment, the civil case was an instrumental part of defendant's plan. The evidence at trial, witnesses testified specifically, Mr. Ebeling and Mr. Falco, Mr. Ebeling in particular, that defendant picked Cigna because it had a very bad track record on bad faith losses in litigation. Well, I guess one way to look at it would be if they had paid the amount and it were found to be fraudulent, it would be a different amount than if they had litigated and they may have upped their losses by litigating, which do you understand what my... I understand, but I don't believe that a victim of a crime should be forced to pay over money to somebody who's trying to defraud them and then have to litigate to get it back. In that case, there would have been litigation involved as well, except they would have been out the cost of the policy in addition to the attorney's fees and whether or not they would have gotten that back would be very speculative on their part. And for certainly a business, that would be a very bad business decision to pay and then litigate to get something back that they may never see again. But in addition, defendant wrote letters to Cigna before the lawsuit began and the letter specifically started the litigation, threatening lawsuits, threatening bad faith litigation that it'd be easier to pay the defendant on the policy than to litigate this case to the fullest. So it was alleged in the indictment that the litigation was part of defendant's plan and certainly defendant carried that litigation to its utmost extreme. He went through extensive pretrial discovery depositions where he prepped the witnesses, specifically Ebeling and Falco, and prepped them to maintain the false Livovich story during that litigation. Then the matter proceeded to trial. At no time did defendant say, all right, I've taken this far enough, let me stop. He kept on going. He took the matter to trial where, again, he prepped witnesses to testify falsely and where he himself testified falsely. He lost. He didn't stop there. He brought the matter to the Ninth Circuit. He lost. He didn't stop there. He tried to obtain a cert which was denied from the Supreme Court. And to this day even, he has not conceded that the Livovich story is false and that he was wrong, but he pursued that litigation to its utmost extreme, causing the victim, in this case Cigna, to litigate it and to defend years of litigation. Defendant had the opportunity at any given point to put a stop to that, and he didn't. And that's why the district court found that it was part and parcel of defendant's scheme. All the evidence at trial supported that. Thank you, counsel. Thank you, Your Honor. And we'll give you a couple of minutes for rebuttal. Thank you very much. I'll speak quickly. The ‑‑ it seems to me the government is making the same argument that we dispute, and that is in saying to this day the defendant hasn't admitted the Livovich story is false, as though that was the focal point of the civil litigation, I think is a misunderstanding or a misleading of what that civil litigation was all about. And one need only read the published opinion of this Court affirming the judgment for Cigna to know that it wasn't the Livovich story that that case turned on. I have three responsive remarks on the 3292 issue. First, we've outlined the legislative history. The prior published opinion discussed the legislative history. There really isn't anything in the legislative history that supports the government's really bald assertion that the reference to the grand jury in panel to investigate the offense is a venue provision. That's just ‑‑ that's a good guess that the government might make, but there's just nothing to support it, that that's what Congress meant, is we're just talking about venue here. Secondly, the government has already conceded in oral argument of the pretrial writ on this very issue, and we quoted it on page 11 of the reply brief, in response to Judge Thomas's question, well, there is in this case, though I think we can see, that there was no grand jury which was in panel to investigate this offense at the time you made the request. Is that true? Judge Thomas asks Assistant United States Attorney Marcus, who argued the case for the government. The answer, well, that's true, is his response. It seems to me that the government has conceded that that requirement of the statute was not met. And so now the government argues it doesn't matter. But it would ‑‑ I think it would be ‑‑ I think the government should be stopped from saying, oh, yes, it was met because we issued a subpoena or we had in our mind to get evidence. Well, if there's a difference between preparing to go to a grand jury and paneling a grand jury, and I guess as I understood their position today, it is not that a grand jury was actually in panel at the time, but only that the preparatory stuff was being done. So ‑‑ Your Honor, and we argue in the reply brief that planning to go to a grand jury does not meet whatever is required under 3292 because of the language that says a grand jury is in panel. If I can read my notes, I have one final comment. I appreciate the Court's indulgence. Oh, I would ask the Court to consider the significance of interpreting 3292 in light of the government's additional argument that in this case the statute of limitations never even ran. The government makes that argument in the Respondent's Brief, and I refer to it in the reply brief. But this is on the secondary 3292 issue, and that is whether final action was ever taken. And the government says, well, you know, we still had ‑‑ we were still hoping to find some of the witnesses. The Italian government said they couldn't find some of the witnesses that we wanted, so final action never occurred. The government's view is that 3292 is more or less a governmental carte blanche to extend the statute of limitations as long as the government wants it to be extended. Here the government gave status reports to the district court saying, well, sure, it's true that as of March of 80 ‑‑ as of March of April of 97 ‑‑ no, I'm sorry, May of 98, it's true that the government agreed to give us everything we asked for, but that isn't final action because we can't find some people. So the government's view is that the statute of limitations is so insignificant in the mind of Congress that as long as the government is thinking about presenting evidence to a grand jury, that's enough to constitute the prerequisites for extending the statute of limitations. And as long as the government asks for someone that can't be found, the statute never runs. In other words, the final action is never taken. And I cannot understand how the government can square that with the repeated statements that the United States Supreme Court as recently as last term in Stagner, but as early as Marion in the earlier cases, saying that the statute of limitations is a presumption by Congress that after a certain period of time, a defendant can't get a fair trial. Thank you, counsel. Thank you. We appreciate the arguments of both parties. The case just argued is submitted. They were very helpful arguments. And we will stand adjourned. All rise for the session to be adjourned.
judges: Dw Nelson, Gibson, Graber